UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MCCURDY,<br><br>    Plaintiff,<br><br>    v.<br><br>L. THOMAS,<br><br>    Defendant. | Case No. 18-06232 BLF (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br><br>(Docket No. 15) |

    Plaintiff, a California inmate, filed the instant *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendant L. Thomas, a physician assistant at Pelican Bay State Prison ("PBSP").[1] The Court found the complaint, Dkt. No. 1, stated a cognizable claim under the Eighth Amendment and ordered Defendant to file a motion for summary judgment or other dispositive motion. Dkt. No. 2.

    Defendant Thomas filed a motion for summary judgment on the grounds that she was not deliberately indifferent to any serious medical need, and she is entitled to qualified

---

[1] The claim against Defendant L. Thomas was severed from *McCurdy v. Rivero, et al.*, Case No. 17-01043 BLF (PR), and filed as this separate action in accordance with Plaintiff's wishes. (Docket No. 2 at 2.)

immunity. Dkt. No. 15, (hereinafter "Mot."[2]). Plaintiff filed a "declaration in opposition," Dkt. No. 32, along with exhibits in support thereof, Dkt. No. 33, Exs. A-V. Defendant filed a reply. Dkt. No. 34.

For the reasons stated below, Defendant's motion for summary judgment is **GRANTED**.

## DISCUSSION

### I. <u>Statement of Facts[3]</u>

On April 18, 2016, Plaintiff arrived at PBSP where he remained until he was transferred to another prison on February 7, 2017. Dkt. No. 1 at 41, 53. During this time, Defendant Thomas was Plaintiff's physician assistant ("PA") from April 18, 2016 until September 2016, when Plaintiff was moved to a different unit at PBSP. Thomas Decl. ¶¶ 1, 12. During this time, Plaintiff suffered from chronic abdominal pain, occasional diarrhea and constipation, and occasional bloody stool. *Id.*

According to his medical records, Plaintiff was diagnosed with irritable bowel syndrome ("IBS") in January 2016, before his arrival at PBSP. *Id.* ¶ 13; EA-A, 113; EA-C, 341. According to Defendant, an IBS diagnosis means that a patient is suffering from reoccurring stomach pain alongside changes in bowel movement, like diarrhea and constipation. Thomas Decl. ¶ 14. Defendant states that the causes of IBF remain unclear, and there are multiple potential causes of IBS symptoms, which range from non-threatening factors, e.g., food sensitivity, intestinal bacteria outgrowth, and high levels of stress, to the result of celiac disease and terminal illnesses like colon cancer. *Id.* At the

---

[2] In support of her motion, Defendant Thomas provides her own declaration, Dkt. No. 15-1, along with declarations from the following: Dr. D. Jacobsen, the current Chief Medical Executive at PBSP beginning March 2016, Dkt. No. 15-2; and counsel Robert Rogoyski, Dkt. No. 15-3. Defendant also submits exhibits containing authenticated copies of relevant portions of Plaintiff's medical records, as well as prison guidelines and operations manual related to health care, among other items, Dkt. No. 15-4, (hereinafter "EA-" followed by the exhibit letter).

[3] The following facts are not disputed unless otherwise stated.

2

time of his arrival at PBSP, Plaintiff's medical history showed that the cause of his abdominal issues was unknown. *Id.* ¶ 15; EA-C, 341-43.

### A. Prescription for Dicyclomine

While under her care, Plaintiff made several requests for Dicyclomine to Defendant Thomas. Thomas Decl. ¶ 16.

Defendant sets forth the following information regarding Dicyclomine. *Id.* at ¶¶ 17, 18. Dicyclomine is an anti-spasmodic medication, which temporarily relaxes the muscles in the gut and reduces cramping. *Id.* ¶ 17. Dicyclomine is therefore often prescribed to pregnant patients experiencing morning sickness. *Id.* Dicyclomine can also be a first line of treatment for IBS symptoms like stomach cramping and diarrhea. *Id.*; EA-H, 4.[4] However, Defendant asserts that long-term use of Dicyclomine has not been clinically established, and is therefore considered not indicated for long-term use. *Id.*; EA-H, 4-5. There are several reasons why Dicyclomine may not be an appropriate medication for many patients. *Id.* The evidence of the drug's efficacy and safety for patients in general is weak. *Id.* Firstly, the California Correctional Health Care Services Care guide does not recommend muscle relaxants, like Dicyclomine, for treating chronic pain, noting that there are "no current studies supporting their use." *Id.*; EA-G, 37. Second, for many patients is ineffective or becomes ineffective during the course of treatment. *Id.*; EA-H, 1-5. Third, Dicyclomine does not treat the underlying cause of abdominal issues even when it is effective for treating symptoms. *Id.* Fourth, Dicyclomine can mask symptoms for more severe underlying conditions – a particular concern when the cause of a patient's symptoms is unknown. *Id.* Finally, Dicyclomine can be addictive when used for an extended period. *Id.*; EA-H, 1. Withdrawal symptoms, such as hypertension, anorexia, and depression, can occur in patients after regular use of the drug. *Id.* Such symptoms are

---

[4] Under exhibit EA-H, Defendant submits an article published on December 3, 2015, by the Canadian Agency for Drugs and Technologies in Health titled, "Dicyclomine for Gastrointestinal Conditions; A Review of the Clinical Effectiveness, Safety, and Guidelines."

3

unpleasant for the patient and may harm the patient by masking symptoms of a more serious condition. *Id.* The risk of addiction is higher in patients with a history of substance abuse. *Id.*

Plaintiff disputes Defendant's sources for the above information on Dicyclomine, asserting "her source doesn't seem very reliable and is unclear." Opp. at 13. Plaintiff asserts that he had been treated with Dicyclomine by physicians at other institutions and had never before been warned that it was addictive, and that he had been given the medication "in bulk weeks at a time." *Id*. at 3. Plaintiff states, "If what def states was true officials wouldn't have prescribed it this way." *Id.*

### B. Medical Diets

While under her care, Plaintiff made several requests for a special medical diet to Defendant Thomas. Thomas Decl. ¶ 19.

Medical diets are specialty services within the California state prison system. *Id.* at. ¶ 20; EA-I, 1. PBSP is among the limited number of facilities that provide medical diets. *Id.*; EA-I, 11. PBSP has specialty diet regimens available for patients with gluten sensitivity, liver disease, and renal or kidney disease. *Id.*; Jacobsen Decl. ¶ 18; EA-I, 6-10. According to the "Health Care Department Operations Manual" for the California Correctional Health Care Services ("CCHCS"), there is a specific procedure for ordering "medically and clinically necessary therapeutic diets." EA-I, 1. After first identifying the medical condition that necessitates special dietary considerations, the primary care providers must refer their patients to consultations with registered dieticians. *Id.* After consultation, the registered dieticians then provide any recommendations and document it in the health record. *Id.* at 2.

### C. Complex Care Committee

At one time, Plaintiff requested a referral to PBSP's Complex Care Committee ("Committee") which Defendant asserts she was not made personally aware. Thomas Decl. ¶¶ 21, 39.

4

The Committee is a medical review board made up of facility physicians, pharmacists, and psychiatrists. *Id.* at ¶ 22. The Committee generally assists primary care providers in two situations: (1) as an advisory resource where patients' medical options include prescription narcotics and certain other dangerous medications; and (2) to assist in the care of inmate-patients with severe or terminal illnesses like cancer, when these illnesses present complex pain management concerns. *Id.*; Jacobsen Decl. ¶ 21. The Committee is also available at the request of a clinician for advice, such as when the clinician feels that standard diagnostic and treatment options have been exhausted in a complex case. *Id.*

### D. Plaintiff's Medical Treatment

On May 8, 2016, Plaintiff submitted a standard health services request (form 7362) for the medication Dicyclomine to treat his abdominal pain. Thomas Decl. ¶ 24; EA-B, 344. A registered nurse scheduled Plaintiff for a follow-up with Defendant Thomas for May 10, 2016. *Id.*

At the May 10 visit, Plaintiff complained of diarrhea, occasional stomach cramping, and occasional blood in his stool. *Id.* He also insisted on getting Dicyclomine for these symptoms. *Id.*; EA-C, 341-43. According to Defendant, she followed CDCR medical care guidelines for assessing inmate-patients in pain. *Id.* at ¶¶ 25-26; EA-F, 38 (California Prison Health Care Services Pain Management Guidelines); EA-G, 3-4 (CCHCS Care Guide). Those guidelines include a series of steps, the first being a review of the patient's medical history with particular attention to substance abuse and attempted procedures and treatment. *Id.* Defendant reviewed Plaintiff's medical file and noted that he had been experiencing abdominal issues for over a year. *Id.* at ¶ 26; EA-A, 992. The record showed that Plaintiff was on a trial of Dicyclomine that was scheduled for one more renewal on May 19, but that he had already used up his last allotment by the time of this visit. *Id.*; EA-C, 0341-043. Plaintiff's record also showed that he was diagnosed with IBS while at his previous facility. *Id.* However, he had not received diagnostic stool and blood tests, a

5

rectal exam or colonoscopy to investigate his symptoms or confirm the diagnosis. *Id.* Plaintiff had also never been on dietary regimens. *Id.* Lastly, Plaintiff's record showed a long history of mental health issues, methamphetamine and heroin abuse, as well as drug seeking behavior. *Id.*; EA-A, 184, 992. In light of Plaintiff's history of substance abuse, his behavior, and her medical knowledge, Defendant decided not to provide any early renewal of Dicyclomine. *Id.* at ¶¶ 27, 28.

Also at the May 10 visit, Defendant discontinued two of Plaintiff's prescriptions. *Id.* at ¶ 29. The first was for Loperamide, an anti-diarrhea drug that is normally available over the counter outside of a prison context; in the prison population, Loperamide is used to treat acute diarrhea for a short period. *Id.* Plaintiff did not have acute diarrhea and had already been taking Loperamide for a longer period than is typically recommended. *Id.* Furthermore, Loperamide is usually not prescribed when a patient has bloody stools, and Plaintiff reported having an occasional bloody stool. *Id.* Accordingly, Defendant believed that Loperamide was no longer medically appropriate or medically necessary. *Id.* The second prescription that was discontinued was for allergy relief eye drops. *Id.* at ¶ 30; EA-C, 342. Based on Plaintiff's description of his mild allergy symptoms, Defendant determined that the eye drops were not needed to protect his life, were not preventing significant illness or disability, and were not alleviating severe pain and therefore not medically necessary. *Id.*

Defendant ordered a series of stool and blood tests to address Plaintiff's lack of abdominal diagnostics. *Id.* at ¶ 32; EA-C, 0343. She also advised Plaintiff on how to keep from lactose in order to determine whether Plaintiff was lactose sensitive and avoidance could alleviate discomfort. *Id.*; EA-C, 0342. The testing would establish if Plaintiff was gluten sensitive, help determine whether he needed a referral to a dietician, show if Plaintiff had experienced an outgrowth of abdominal bacteria, and if there was blood in his stool. *Id.*

Plaintiff's stool and blood were sampled for examination on May 19 and 20, 2016.

*Id.* at ¶ 34; EA-D, 592-94. On May 24 and 25, the results came in negative for an outgrowth of abdominal bacteria, antibodies, and gluten sensitivity. *Id.* However, the tests were positive for fecal occult blood, which refers to microscopic traces of blood in the feces that is not visibly apparent to the naked eye. *Id.* Accordingly, Defendant believed a rectal exam was appropriate to check for inflamed hemorrhoids or ulcers, or other more serious causes. *Id.* She scheduled the rectal exam for Plaintiff, to take place on June 7, 2016. *Id.*; EA-C, 327.

On June 7, 2016, Plaintiff was seen by Defendant for the rectal exam. *Id.* at ¶ 36; EA-C, 308-11. At this visit, Plaintiff reported that he was on a hunger strike "to get a 'medical diet,' [and] 'to get my meds for my stomach.'" EA-C, 308. According to the records submitted by Plaintiff, he began the hunger strike on approximately June 2, 2016, and ended it on June 11, 2016. Opp., Ex. I.

During the exam, Defendant observed no hemorrhoids or masses. *Id.* at ¶ 36; EA-C, 308-11. Administering a rapid occult blood test (hemoccult), she found no presence of occult blood in Plaintiff's stool. *Id.* Using an anoscope, she found that Plaintiff was free of hemorrhoids and that his prostate was normal. *Id.* In light of the negative rectal exam, Defendant concluded that Plaintiff did not meet the criteria for additional studies, including more invasive procedures like a colonoscopy. *Id.*

During the visit for his rectal exam, Plaintiff complained of occasional stomach cramps when waking up in the morning and occasional constipation. *Id.* at ¶ 37; EA-C, 308. Plaintiff also explained that his abdominal discomfort did not lessen after attempting a lactose free diet regiment. *Id.* For his abdominal discomfort, Plaintiff requested a special medical diet. *Id.* Defendant explained to Plaintiff that he did not qualify for any of the special medical diets available to inmate-patients, including gluten or lactose free diets, because his trials and lab tests showed that Plaintiff was not gluten or lactose sensitive. *Id.*; EA-C, 309; EA-I, 7, 11; EA-D, 592-94. Nor did Plaintiff present symptoms for liver, renal, or kidney disease, to qualify him for other medical diets. *Id.* Accordingly,

7

Defendant did not recommend Plaintiff to a dietician for a special medical diet. *Id.*

On June 13, 2016, Plaintiff submitted a form 7362 request for medication for his abdominal pain; Defendant was not made aware of this request at that time. *Id.* at ¶ 39; EA-B, 300. A registered nurse followed up with Plaintiff on June 15, 2016. *Id.* The nurse's encounter form mentions that Plaintiff requested a referral to PBSP's "pain committee" as well as a dietary consult. *Id.*; EA-B, 301-02. The nurse scheduled a meeting for Plaintiff with Defendant for June 28, 2016. *Id.* at ¶ 40; EA-B, 300.

According to Plaintiff, he saw Defendant along with the nurse on June 15, 2016, and mentioned the Committee. Opp. at 16. He also claims that he mentioned the Committee before the rectal exam. *Id.* at 17.

At the June 28 meeting, Plaintiff made no mention of the Complex Care Committee to Defendant. *Id.*; EA-C, 292-95. Plaintiff complained of having three to four bowel movements per day, diarrhea, morning stomach cramps, and the presence of mucus in his stool. *Id.* at ¶ 42; EA-C, 293. Plaintiff insisted on a new prescription of Dicyclomine and a special medical diet for these symptoms. *Id.* Defendant explained that Dicyclomine was not appropriate for his long-term use and denied the request. *Id.* at ¶ 43; EA-C, 294. Defendant also explained that a medical diet was not appropriate because there was no medical necessity for it; accordingly, she did not recommend Plaintiff to a dietician. *Id.* at ¶ 46; EA-C, 294.

On the following day, June 29, 2016, Defendant met with Dr. Jacobsen, PBSP's Chief Medical Executive, to discuss an appropriate response to Plaintiff's persistent complaints of abdominal issues. *Id.* at ¶ 47; EA-C, 292. Defendant believed a referral to a gastroenterologist for a possible colonoscopy was appropriate to help identify the underlying causes of Plaintiff's symptoms and rule out certain serious illnesses. *Id.* She brought this recommendation to Dr. Jacobsen who agreed with and approved the plan. *Id.*; Jacobsen Decl. ¶ 24. Defendant ordered a gastroenterology consultation for Plaintiff. Thomas Decl. ¶ 47; EA-E, 666.

8

On September 13, 2016, Plaintiff received the consult with a gastroenterologist in Eureka, California. *Id.* at ¶ 48; EA-E, 754-56. Defendant reviewed the findings on September 19, 2016. *Id.* The gastroenterologist noted Plaintiff was well-nourished and alert. *Id.* He identified slight tenderness in Plaintiff's right lower quadrant. *Id.* He also confirmed Plaintiff was experiencing changes in his bowel, including diarrhea. *Id.* In light of his symptoms and medical history, the specialist approved Plaintiff for a colonoscopy. *Id.* The procedure took place on September 30, 2019, about the time that Plaintiff moved out from Defendant's unit at PBSP and was no longer in Defendant's care. *Id.* at ¶ 49; Jacobsen Decl. ¶¶ 6, 26. According to Plaintiff, Defendant Thomas remained his PCP until he was transferred from PBSP in February 2017. Opp. at 18.

According to Plaintiff's medical records, the results of the colonoscopy showed Plaintiff had a normal colon but that he had internal hemorrhoids. Thomas Decl. at ¶ 50; EA-E, 1564. Internal hemorrhoids refer to swollen blood vessels inside the rectum, which may lead to a mucus discharge in the stool. *Id.* at ¶ 50; Jacobsen Decl. ¶ 27. Hemorrhoids are common and are more likely to occur with aging, as the tissue that supports the veins in one's rectum weakens and stretches. *Id.* Defendant states hemorrhoids are not a cause of IBS symptoms like cramping and changes in bowel movement, although strained bowel movements may cause internal hemorrhoids. Thomas Decl. ¶ 50. According to Defendant, neither Dicyclomine nor any of the specialty medical diets available at PBSP would treat internal hemorrhoids. *Id.*; Jacobsen Decl. ¶ 27. A positive hemorrhoid finding does not warrant a referral to the Committee. Jacobsen Decl. ¶ 27.

## II. Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

9

at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp*., 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir.

10

1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; see, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A. Deliberate Indifference

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id*. The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id*. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

11

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, *see Toguchi v. Chung*, 391 F.3d 1051, 1058, 1059-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

### B. Analysis

Plaintiff claims that Defendant acted with deliberate indifference when she discontinued medication that helped with some of his symptoms and denied him a special diet and referral to the "pain committee." Dkt. No. 1 at 43.

Defendant asserts that she was not deliberately indifferent to Plaintiff's needs throughout the time he was under her care. Mot. at 13. She asserts that when treatment has been provided, as was the case here, Plaintiff must show that the chosen course of treatment was medically unacceptable under the circumstances and that the defendants chose this course "in conscious disregard of an excessive risk to plaintiff's health." *Id.* (citing *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (quoting *Jackson*, 90 F.3d at 332). Defendant asserts that she treated Plaintiff's abdominal issue on at least 6 occasions. *Id.* at 13-14; *see generally* EA-C. She began with an independent assessment of his abdominal symptoms, medical record, and behavior. *Id.* at 14. She also created and began executing a comprehensive treatment plan for Plaintiff in accordance with the CCHCS, Care Guide which recommends diagnostic testing to identify a patient's underlying issue

12

and type of pain before diagnosing and prescribing medication. *Id.* By the end of their initial meeting on May 10, 2016, Defendant had educated Plaintiff on how to conduct a diagnostic dietary regimen and ordered a series of diagnostic tests to identify the underlying cause of his abdominal discomfort. *Id.* With respect to the claim that she wrongfully refused to prescribe Dicyclomine, Defendant asserts that her refusal to over-prescribe that medication was not only consistent with accepted medical practice, but also safe and effective. *Id.* Defendant also asserts that her decision not to seek a specialized meal diet on Plaintiff's behalf was also medically sound. *Id.* at 15. Lastly, Defendant asserts that she was unaware that Plaintiff sought the Committee's review, and that even if she had been made aware, a referral was not medically necessary. *Id.* at 16. Defendant asserts that the evidence shows that she provided extensive, medically-appropriate treatment to Plaintiff, and therefore Plaintiff cannot establish the second element for an Eighth Amendment claim – that she deliberately ignored his abdominal pain and needs and refused him necessary medical treatment. *Id.* at 17.

In opposition, Plaintiff first sets forth a long history of medical treatment at various institutions before his arrival at PBSP, claiming that the matters are all related. Opp. at 3. However, as Plaintiff points out in disagreement, the Court ordered unrelated claims to be severed and filed separately in the appropriate courts that had jurisdiction over the unrelated defendants. *Id.* Accordingly, any arguments or facts asserted in Plaintiff's opposition that have nothing to do with PBSP or Defendant Thomas shall not be considered as irrelevant and outside the scope of this action.

With respect to his claims against Defendant Thomas, Plaintiff first asserts that her claim that Dicyclomine is addictive is false. Opp. at 7. He points out that he had never before been warned that it was addictive by any physician at other institutions who had prescribed it for him. *Id.* at 3. Plaintiff states, "If what def states was true officials wouldn't have prescribed it this way." *Id.* Plaintiff also asserts that he requested the early refill of the medication before it expired in order to avoid being without it for a few days

13

when the pharmacy was closed on the weekend, and not because he is addicted to it. *Id.* at 7, 9. Plaintiff asserts that Defendant discontinued "each and every medication and nutritional supplement [he] was prescribed," and refused to prescribe any pain reliever. *Id.* at 9-10. Contrary to Defendant's argument, Plaintiff asserts that he was not treated at all. *Id.* at 11. He claims that Dicyclomine was not the only medication he requested, and that he also requested physical therapy, hot and cold pack, or other types of medication and supplements. *Id.* He asserts that Defendant was discriminating against him for his drug history. *Id.* at 19. Plaintiff also states that he sought a referral to the pain committee "because it was the only way to go above her in order to get a second opinion by a real doctor and possibly get medication or care that would offer more relief." *Id*. at 11.

In reply, Defendant asserts that it matters not that her manner of treatment differed from other doctors in previous years or at other institutions because Plaintiff must establish that her chosen course of treatment was "medically unacceptable under the circumstances." Reply at 1-2. Furthermore, Defendant asserts that Plaintiff's assertion of discriminatory intent is in fact a substantive disagreement on an issue of medical opinion: "whether and to what extent a patient's history of substance abuse should be weighed when prescribing Dicyclomine." *Id.* at 2. Defendant asserts that a mere difference of medical opinion between physician and patient in this regard, or with respect to any aspect of Plaintiff's treatment, does not constitute deliberate indifference. *Id.* at 2-3. Lastly, Defendant objects to the 290 pages of exhibits submitted with Plaintiff's opposition, as none of the exhibits are authenticated and all appear to be intended for use as hearsay or improper expert opinion. *Id.* at 3. But even if the Court were to consider them, Defendant asserts that none of the exhibits demonstrate that her medical treatment decisions were medically unacceptable under the circumstances. *Id.* Defendant asserts in conclusion that Plaintiff has not established "beyond debate" that her medical treatment was constitutionally inadequate. *Id.* at 4.

The evidence presented does not show a genuine dispute as to any material fact

14

relating to Plaintiff's claim of deliberate indifference against Defendant Thomas with regard to his medication, special diet, or referral to the pain committee. Assuming he suffered from a serious medical condition, Plaintiff's medical records show that he received regular treatment for his chronic abdominal pain from Defendant Thomas. *See supra* at 5-9. Within a couple of weeks of his arrival at PBSP, Plaintiff was seen by Defendant Thomas who noted his complaints and request for Dicyclomine. *Id.* at 5. In accordance with medical care guidelines, she reviewed his medical history with special attention to substance abuse and attempted procedures and treatment. *Id.* at 5-6. Defendant decided not to provide an early refill of Dicyclomine, which she believed was addictive, because of Plaintiff's history of substance abuse, his behavior, and her medical knowledge, and later declined to renew the medication altogether because she did not believe it was medically appropriate for long-term use. *Id.* at 6, 8. It matters not whether Dicyclomine is or is not actually addictive. The material fact is what Defendant believed in that regard, and how her medical knowledge affected her manner of treatment to Plaintiff. Defendant states that Plaintiff's history of substance abuse coupled with her knowledge that Dicyclomine posed a risk of addiction which was heightened in users with a history of substance abuse made her decide not to provide an early refill. Thomas Decl. ¶¶ 27-28. She also decided later not to renew the prescription for Dicyclomine at all because it was not medically appropriate: it was not appropriate for long-term use, there was no established efficacy for long-term use, it could interfere with his care by masking recurring symptoms, and inhibit her ability to investigate causes, and Plaintiff was at a high risk of addiction given his history of substance abuse and already long-term use of the drug. *Id.* at ¶¶ 43-44. Accordingly, it cannot be said that her decision to discontinue indicates deliberate indifference to serious risks to Plaintiff. Furthermore, Defendant ordered diagnostic tests which appeared not to have been done, and then performed a rectal exam to rule out hemorrhoids or ulcers, or more serious causes for Plaintiff's abdominal complaints. *Id.* at 7. When the tests yielded negative or normal results although Plaintiff's

15

complaints persisted, Defendant sought and gained approval to refer Plaintiff to a gastroenterologist for a colonoscopy. *Id.* at 8. The subsequent colonoscopy revealed that Plaintiff had internal hemorrhoids. *Id.* at 9. None of these actions indicate that Defendant knew Plaintiff would face a substantial risk of serious harm and failed to take steps to abate that harm. *See Farmer*, 511 U.S. at 837. Rather, she sought to investigate Plaintiff's complaints and ordered diagnostics tests to provide appropriate treatment, and ultimately, her actions lead to a medical diagnosis of internal hemorrhoids.

Even if it were true that Defendant's course of treatment, i.e., discontinuing Dicyclomine and other supplements, was different from Plaintiff's previous medical providers, this difference in treatment does not establish that Defendant was acting with deliberate indifference. A difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60. Rather, Plaintiff must show that Defendant's chosen course of treatment was medically unacceptable under the circumstances *and* that she chose it in conscious disregard of an excessive risk to Plaintiff's health. *Id.* at 1058. Dr. Jacobsen's professional medical opinion that Defendant Thomas "provided appropriate medical care that was tailored to [Plaintiff's] individual medical needs" and that it was "at all times consistent with acceptable standards of medical care and CDCR policies and guidelines" is evidence that her chosen course of treatment was medically acceptable under the circumstances. Jacobsen Decl. ¶ 28. Nor is there any evidence that Defendant chose her course of treatment in conscious disregard of an excessive risk to Plaintiff's health. Rather, she decided not to renew Dicyclomine because of its addictive potential coupled with Plaintiff's addictive behavior, in addition to several other concerns. *See supra* at 15. The fact that previous doctors did not bring these issues to Plaintiff's attention does not mean Defendant's concerns were invalid.

With respect to Plaintiff's diet, there is also no genuine dispute of material fact that Defendant's actions were deliberately indifferent. There is no dispute that she investigated

16

whether Plaintiff's abdominal issues could be managed by avoiding gluten and lactose but neither seemed to be the case. *Id.* at 7. Defendant did not believe there was any medical necessity to pursue a special diet, based on a food sensitivity or a serious disease, and therefore she did not recommend Plaintiff to a dietician. *Id.* Even when Plaintiff went on a hunger strike, there is no indication that Defendant had any reason to believe there was an excessive risk of harm to Plaintiff's health if she did not acquiesce to his request for a special diet since there was no medical reason why he could not consume the regular diet. Indeed, Defendant noted in her progress notes from the June 7, 2016 visit that it was unclear "as to what [Plaintiff] wants" since he requested both a medical diet as well as a kosher diet. EA-C, 309. Defendant's progress notes also noted the hunger strike and indicated that she advised Plaintiff that he should eat to avoid compromising his own personal care. EA-C, 309. Bottomline, whether or not Plaintiff needed a special diet to treat his abdominal complaints was a difference of opinion between himself and Defendant. Such a difference of opinion between a prisoner-patient and a medical official regarding treatment, i.e., the need for a special diet, does not give rise to a § 1983 claim. *See Franklin*, 662 F.2d at 1344.

Lastly, there is no genuine dispute of material fact on the issue of whether Defendant acted with deliberate indifference with respect to the lack of referral to the Committee. Defendant asserts that she was unaware at any time during the course of treatment that Plaintiff wanted to be referred to the Committee. *See supra* at 7-8. Plaintiff asserts that he personally requested it of her at different times during June 2016. *Id.* Be that as it may, Defendant asserts that had Plaintiff made the request, she would have explained that such a referral was not indicated. Thomas Decl. ¶ 41. Plaintiff was not on a narcotic medication of the type addressed by the Committee, and his symptoms did not indicate a narcotic was necessary. *Id.* Furthermore, Plaintiff was not suffering from a complex medical situation, such as a terminal disease, and the diagnostic and treatment modalities for IBS are well-understood. *Id.* Lastly, Defendant asserts that a referral was

17

not appropriate until a thorough investigation of a patient's symptoms are undertaken to rule out potential causes and adequately inform the Committee of the situation; Plaintiff's condition had not yet been thoroughly examined, such as with a colonoscopy, to yet warrant such a referral. In other words, a referral to the Committee at that time would have been premature. Accordingly, even construing the facts in favor of Plaintiff and accepting as true that Defendant knew of his request for a referral and denied it, it cannot be said that the denial establishes deliberate indifference because it is yet another example of a difference of opinion between Plaintiff and Defendant that does not give rise to a § 1983 claim. It is undisputed that on June 29, 2016, Defendant met with Dr. Jacobsen to obtain authorization for a referral to a gastroenterologist for a colonoscopy, which ultimately lead to the diagnosis of Plaintiff's internal hemorrhoids. Accordingly, it cannot be said that Defendant denied Plaintiff a referral to the Committee with a deliberate disregard of a substantial risk of serious harm to Plaintiff when she in fact took further steps to obtain appropriate medical treatment for Plaintiff with a referral to an outside specialist.

Based on these undisputed facts, Plaintiff has failed to show that Defendant Thomas's chosen course of treatment was medically unacceptable under the circumstances and that she chose this course in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058. Nor do the differences of opinion between Plaintiff and Defendant over the course of treatment with respect to his diet and referral to the Committee give rise to a § 1983 claim. *Franklin*, 662 F.2d at 1344. Plaintiff has failed to meet his burden of identifying with reasonable particularity the evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, Defendant Thomas is entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323-24.

///

///

///

18

**CONCLUSION**

For the reasons stated above, Defendant L. Thomas's motion for summary judgment, (Docket No. 15), is **GRANTED**.[5]  The Eighth Amendment deliberate indifference claim against her is **DISMISSED** with prejudice.

This order terminates Docket No. 15.

**IT IS SO ORDERED.**

Dated: March 1, 2020

BETH LABSON FREEMAN
United States District Judge

Order Granting MSJ
PRO-SE\BLF\CR.18\06232McCurdy_grant-msj

---

[5] Because the Court finds that no constitutional violation occurred, it is not necessary to reach Defendant's qualified immunity argument.